T.C. Memo. 2016-163

UNITED STATES TAX COURT

SPIRIDON SPIREAS AND AMALIA KASSAPIDIS-SPIREAS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10729-13.                          Filed August 24, 2016.

William F. Colgin, Robert R. Martinelli, and Christina K. Harper, for petitioners.

Gerald A. Thorpe, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge: The Internal Revenue Service (IRS or respondent) determined, for 2007 and 2008 respectively, deficiencies in petitioners' Federal income tax of $4,083,264 and $1,745,701. The deficiencies arose from respondent's conclusion that the royalties Spiridon Spireas (petitioner) received under a license

**[*2]** agreement are taxable as ordinary income rather than as capital gain. The question we must decide is whether petitioner transferred "all substantial rights" to the relevant technology, such that the royalties he received are eligible for capital gain treatment under section 1235.[1] Finding as we do that petitioner retained valuable rights in the technology that was the subject of the transfer, we sustain respondent's determination that section 1235 does not apply and that the royalties constituted ordinary income.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated by this reference. Petitioners re-sided in Pennsylvania when they filed the petition.

Petitioner immigrated to the United States from Greece in 1985 and com-pleted master's and doctoral studies in pharmaceutical technology and industrial pharmacy. He obtained his Ph.D. degree from St. John's University in 1993. Dr. Sanford M. Bolton, now deceased, was chairman of the pharmaceutical sciences department at St. John's when petitioner was writing his doctoral thesis and served as his faculty adviser.

---

[1] All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all dollar amounts to the nearest dollar.

**[*3]** A.  <u>The Liquisolid Technology and Patents</u>

Petitioner's dissertation addressed techniques designed to improve, in laboratory-scale studies, the solubility of drugs not easily dissolved in water. Petitioner subsequently became a renowned expert in the science of drug delivery, including "liquisolid" technologies, which involve novel methods of drug formulation. He is an inventor and has secured, jointly or individually, more than 80 U.S. and foreign patents and/or patent applications.

In 1997 petitioner and Dr. Bolton organized Hygrosol Pharmaceutical Corporation (Hygrosol) for the purpose of exploiting the liquisolid technologies they were developing. Hygrosol is an electing small business or "S" corporation. At all relevant times, petitioner and Dr. Bolton each owned 50% of Hygrosol; they took turns serving as its president and vice president. Hygrosol received the royalties at issue in this case, and those royalties flowed through to petitioner and Dr. Bolton.

In laypersons' terms, the liquisolid technology can be thought of as a tool. This tool can be used to create unique formulations for the delivery of a chemical in tablet form, such as a nutritional supplement or a pharmaceutical drug. The liquisolid technology developed by petitioner and Dr. Bolton aimed to solve the problem of low "bioavailability" of water-insoluble drugs.

**[*4]**  "Bioavailability" refers to the extent and rate at which a drug enters the body's systemic circulation and is thus able to have the desired therapeutic effect. Drugs delivered intravenously have a 100% bioavailability rate.  Drugs delivered orally have a lower bioavailability rate because they must first be dissolved in the gastrointestinal fluids and pass through the intestinal wall before reaching the bloodstream.

Soft-gelatin capsules aid bioavailability because the drug is already in a liquid solution, which facilitates quicker and more complete absorption of the drug while in the gastrointestinal track.  The manufacturing process required to produce soft-gelatin capsules, however, can be complex and expensive.  Liquisolid technology involves production of "liquisolid systems," which are powdered forms of drugs in liquid solutions that can be compressed into tablets or placed in hard-gelatin capsules, which are typically cheaper to manufacture.  A major goal of liquisolid technology is to enhance the bioavailability of water-insoluble drugs delivered in these formats.

In 1998 petitioner began developing "granular liquisolid systems," which are liquisolid systems that include a volatile solvent.  Granular liquisolid systems are ideal for drugs that degrade under heat.  The process for making granular liquisolid systems generally involves mixing the drug with volatile and nonvolatile

[*5] solvents without applying any heat to produce the drug solution or suspension.

Petitioner and Dr. Bolton were issued, jointly or individually, four U.S. patents related to liquisolid technology. In June 1996 they applied for, and in September 1998 they were issued, Patent No. 5,800,834 for "liquisolid systems and methods of preparing same" (834 patent). The 834 patent claims a method of using a novel mathematical algorithm to determine acceptable formulations using the liquisolid technology.

In October 1997 petitioner and Dr. Bolton applied for, and in October 1999 they were issued, Patent No. 5,968,550 (550 patent). The 550 patent, which also covered "liquisolid systems and methods of preparing same," was a "division of" the 834 patent. The claims of the 550 patent resemble those of the 834 patent but disclose additional products that can be prepared using the liquisolid technology.

In August 1998 petitioner and Dr. Bolton applied for, and in August 2000 they were issued, Patent No. 6,096,337 (337 patent). In May 2000 petitioner individually applied for, and in July 2002 he was issued, Patent No. 6,423,339 (339 patent). The 337 and 339 patents, which also covered "liquisolid systems and methods of preparing same," were "continuations-in-part" of the 550 patent. In contrast to the processes disclosed in the 834 and 550 patents, the processes dis-

**[*6]** closed in the 337 and 339 patents do not require the use of elevated temperatures.

We will refer to the 834, 550, 337, and 339 patents collectively as the Patents. We will refer to the technology underlying each of the Patents as the liquisolid technology.

B.    Negotiations Toward Licensing Agreement

At the relevant times, Mutual Pharmaceutical Company, Inc. (Mutual), was a company whose business focused on developing and marketing generic drugs. United Research Laboratories, Inc. (URL), was an affiliate of Mutual that distributed pharmaceutical products and some health and nutritional supplements. We will refer to these companies collectively as Mutual.

Petitioner was introduced to Mutual through a professional colleague. In a September 1997 meeting with Mutual, petitioner explained how the liquisolid technology could be used to enhance the bioavailability of various drugs and nutritional supplements, such as CoQ10. He provided examples of pharmaceutical products he was developing, using this technology, in collaboration with other drug companies.

On September 17, 1997, petitioner and Mutual signed a confidentiality agreement. This included an addendum, prepared by petitioner, that excluded

[*7] marketing strategies he was already using for the liquisolid technology. Petitioner included this addendum because he did not want to be foreclosed from using such marketing strategies in collaboration with companies other than Mutual.

During fall 1997 petitioner expected Mutual to propose a collaboration to develop a super-bioavailable CoQ10 product. Instead, Mutual in December 1997 sent him an unsolicited letter asking for his help in developing a capsule form of etoposide. Etoposide is used in chemotherapy to treat certain types of cancer. Petitioner rejected this proposal because (among other things) he was already collaborating with Barr Laboratories, a large drug company, on using the liquisolid technology to formulate etoposide.

On December 23, 1997, Mutual sent petitioner and Dr. Bolton a larger scale proposal that included a draft license agreement. This agreement, if implemented, would have granted Mutual an exclusive license to use, throughout the pharmaceutical industry, the liquisolid technology represented by the 834 patent. Petitioner rejected this proposal because he had no intention of giving Mutual the exclusive right to use this technology. At that time, he was attempting to exploit the liquisolid technology with other pharmaceutical companies and was working with at least two companies in an effort to create super-bioavailable drugs.

**[*8]** In January 1998 petitioner agreed to provide consulting services to Mutual in connection with its research and development (R&D) activities. These services were not directly related to the liquisolid technology. However, while petitioner was providing these services, Mutual succeeded in obtaining FDA approval for two drug products. This boosted petitioner's confidence that it would be able to secure FDA approval if drugs were developed using the liquisolid technology.

In late February 1998 petitioner sent Mutual a letter proposing significant changes to the December 1997 draft license agreement. Instead of granting Mutual an exclusive license to use the liquisolid technology, petitioner proposed that it would receive a license to use that technology only in connection with specific products that the parties agreed to develop. After several months of additional negotiations the parties executed a license agreement based on this principle.

C.    The License Agreement

On June 12, 1998, Hygrosol, Dr. Bolton, and petitioner (collectively, licensors) entered into a license agreement with Mutual (1998 license agreement or agreement). The agreement granted to Mutual the right to use the liquisolid technology, on a product-by-product basis, to develop, produce, and sell within the United States new and generic pharmaceutical drugs, as determined by the parties

[*9] on the basis of unanimous consent.   The agreement began with the following recitals:

> WHEREAS, the founders of Hygrosol, Spireas and Bolton, have obtained a notice of allowance of their patent claims in their application for United States Letters Patent entitled LIQUISOLID SYSTEMS AND METHODS OF PREPARING SAME * * * (the "Patent") * * * ; and
>
> WHEREAS,  Spireas and Bolton developed and are the inventors of all the technology which is the subject of the Patent (the "Technology"); and * * *
>
> WHEREAS, Hygrosol, Spireas and Bolton desire to grant to Mutual and United the exclusive right to utilize the Technology only for the development of new generic drug forms and new drug products (the "Products"), unanimously selected by Hygrosol, United and Mutual and, after so selected, to be developed, produced and sold in the United States.

Section 2 of the agreement, captioned "Grant of Exclusive Rights," provided that the licensors granted to Mutual "[t]he exclusive rights to utilize the Technology only to develop Products that Mutual, United, and Hygrosol, acting in good faith will unanimously select."  Mutual was also granted the exclusive right, within the United States, "to produce, market, sell, promote and distribute * * * said Products containing the Technology."  The "Technology" was defined as "the technology which is the subject of the Patent," which denoted the original 834 patent.

**[\*10]** Section 7.4 of the agreement addressed after-acquired technology. It provided that "[i]f, during development of a Product, a new patent of specific application claims is secured based on the original Patent, the new patent shall be the property of Hygrosol, Spireas and Bolton." However, Mutual in that event would have the right, without paying additional compensation, "to utilize such patent as if described in the definition of 'Patent' set forth above." Thus, the "Technology" that Mutual received the right to use ultimately included not only the 834 patent but also the 550 patent, which was a "division of" the 834 patent, and the 337 and 339 patents, which were "continuations of" the 550 patent.

The term "Products" was defined to mean "new generic drug forms and new drug products" developed using the Technology. "Products" could also include nutritional supplements that were either combined with pharmaceutical drugs or required FDA approval to be marketed as drugs. The term "Products" thus excluded nutritional supplements unconnected to any FDA-approved drug and not requiring FDA approval. Section 5.5 further provided that "[t]he group of potential Products to be selected by the parties to this Agreement shall exclude, at all times during the life of this Agreement, products that Hygrosol, Spireas, and Bolton are developing or are in negotiations to develop for another party."

[*11] Mutual's rights to use the Technology with respect to a particular Product began once the parties agreed in writing to develop that Product and Mutual paid petitioner $10,000 to conduct a feasibility study. During the agreement's first year, the licensors pledged to make a good-faith effort to propose three Products for development. If Mutual determined, after petitioner presented the results of his study, to dispense with further feasibility studies and discontinue developing that Product, the licensors were then free "to offer the Product to any other entity."

If the parties agreed, following completion of feasibility studies, to develop a particular Product, formulation studies would begin under petitioner's supervision with a view to producing a clinical batch of the Product meeting Mutual's specifications for dissolution and stability. That stage would be followed by clinical studies and (if they were successful) development of a marketing strategy for the Product. If Mutual sold a Product, 20% of the gross profit (as defined) was to be paid to Hygrosol quarterly.

If Mutual did not actively develop, produce, or sell a particular Product, the licensors could terminate its exclusive rights with respect thereto. Mutual would also forfeit its exclusive rights with respect to a Product, and such rights would revert to the licensors, if Mutual notified them that it was discontinuing development or marketing of that Product. On the other hand, the agreement permitted

[*12] Mutual to sublicense to a third party its rights with respect to a particular Product; in that event, the licensors were entitled to 50% of the "net proceeds" as defined.

Apart from royalties to be paid on ultimate sale of Products, petitioner was paid in other ways for work performed at various stages of the development process. The $10,000 up-front fee was based on an estimate that the feasibility study for a given Product would take approximately 15 days to complete. For additional time devoted to feasibility studies, petitioner would be paid as an independent contractor at a daily rate of $600. In March 1999 petitioner entered into an employment agreement to serve as vice president of research and development for Mutual. His duties as an employee included laboratory and research activities related to obtaining FDA approvals for the company's products.

The 1998 license agreement granted Mutual rights to use the Technology only in the pharmaceutical field. Petitioner retained rights to use his liquisolid technology to develop vitamins, nutritional supplements, and other health-related products not requiring FDA approval. In February 1998 petitioner engaged one or more professionals to market the liquisolid technology to various companies in the health and nutrition fields. As of June 1998 the right to exploit the liquisolid technology in the health and nutrition fields had substantial value.

[*13] The 1998 license agreement was not petitioner's only effort to commercialize the liquisolid technology within the pharmaceutical field. During 1997 and through the date of that agreement, petitioner worked with other drug companies to develop at least one pharmaceutical product using the Technology. The Technology had potential application to thousands of pharmaceutical products, and Mutual obtained rights to use that Technology only with respect to Products that the licensors presented to it for development. By withholding his assent as to a particular drug, petitioner could reserve to himself and his co-licensors the exclusive rights to develop new formulations of that drug using the liquisolid technology. The licensors could also reacquire rights to use the Technology with respect to Products that Mutual declined to pursue or abandoned after development had begun. The right to use the Technology to develop drugs that were not proposed by the licensors to, or selected for development by, Mutual had substantial value at the time the 1998 license agreement was signed.

D.    Selection of Products for Development

As of the date the agreement was signed, petitioner had not yet developed a commercially viable drug or other product using the Technology. While the Technology included patented concepts for addressing the "low bioavailability" problem, the parties recognized that these concepts would need to be adapted to the

[*14] peculiar properties of each specific chemical or molecule in order to create a new, commercially successful, formulation of that drug. When they executed the 1998 license agreement, the licensors had not identified any Products that would be presented to Mutual for development.

Starting in mid-1998, petitioner screened up to 100 drugs, through preliminary tests, to determine their suitability for development under the 1998 license agreement. Of these, the parties selected more than 20 Products for further development. The agreement specified that these selections had to be memorialized "in writing," and the parties did this by executing short engagement letters. Between June 24, 1998, and December 30, 2002, the parties executed engagement letters committing themselves to pursuing "highly to maximally bioavailable formulations" of various drugs, including Ibuprofen, Lovastatin, and Viagra; and to pursuing "bioequivalent formulations" of various drugs, including Lovastatin, Paxil, and Zoloft. A typical engagement letter was two paragraphs long and was signed by a representative of Mutual and by petitioner as the representative of Hygrosol.

By early 2000 the U.S. molecule patent had expired for a drug called felodipine, which is used to treat high blood pressure. It was manufactured by a large, unrelated pharmaceutical company and marketed under the brand name Plendil.

[*15] Any pharmaceutical company could purchase the felodipine molecule; however, there remained a nonexpired formulation patent on the Plendil product.

Because of its chemical structure, felodipine has low water solubility and degrades if it is exposed to elevated temperatures or light. Petitioner performed preliminary tests on felodipine in early 2000. After doing so, he was hopeful that the Technology could be used to develop a new formulation of felodipine that would overcome the challenges posed by this drug, and achieve bioequivalance with the Plendil product, without infringing on the existing formulation patent.

On March 7, 2000, Mutual sent petitioner an engagement letter addressing the development of three Products, including felodipine. This letter read in full as follows:

> This letter is the formal engagement of Hygrosol and Mutual for generic bioequivalent versions of Rythmol and Plendil Extended-Release, as well as maximally bioavailable formulations of Propafenone, in accordance with the License Agreement between Hygrosol and Mutual dated June 12, 1998.
>
> Attached with this letter is a check for Thirty Thousand Dollars ($30,000) for engagement of these three products, in accordance with the License Agreement. Please sign below if this is acceptable to Hygrosol Pharmaceutical Corp.

**[*16]** Petitioner countersigned this letter (March 2000 engagement letter) in his capacity as vice president of Hygrosol. Felodipine was the 11th drug that the parties had selected for possible development under the 1998 license agreement.[2]

When he signed the March 2000 engagement letter, petitioner had completed roughly 30% of the work that ultimately resulted in a successful new formulation of felodipine. The principal challenges this molecule posed were its low solubility in water and its high sensitivity to heat and light. In solving these problems, petitioner employed the Technology and (in particular) the claims governing "granular liquisolid systems" covered by the 339 patent. But considerable work was required to adapt the Technology to felodipine's idiosyncrasies, regulating the release of the drug from the generic tablet and making the active ingredient stable in tablet form. Petitioner and Mutual refrained from seeking a patent on this formulation in order to prevent competitors from seeing the disclosures that a patent

---

[2]The March 2000 engagement letter also committed the parties to pursuing new formulations of propafenone and Rythmol. Propafenone is the generic name for a drug used to treat heart arrythmia; it was marketed by an unrelated drug company under the brand name Rythmol. Mutual eventually obtained FDA approval for a propafenone formulation and paid royalties therefor to Hygrosol under the 1998 license agreement. In the text we focus mainly on felodipine because it generated 99.64% of the royalty income at issue in this case. However, the analysis for the propafenone formulation is identical in all material aspects to the analysis for the felodipine formulation.

[*17] application would require. However, the felodipine formulation was novel, useful, and nonobvious, and it qualified as patentable.

Under the 1998 license agreement, Mutual obtained the exclusive right to produce and sell within the United States any "Product[] containing the Technology," which included the felodipine formulation. It obtained FDA approval for that formulation, and it has successfully marketed a new generic form of felodipine that resulted from petitioner's application of the Technology. Felodipine and propafenone were the only Products developed under the 1998 license agreement that resulted in commercial success.

E.    Expert Testimony

1.    Dr. David Enscore

Petitioner offered, and the Court recognized, Dr. David Enscore as an expert in drug formulation, development, and manufacturing. Dr. Enscore has a Ph.D. in chemical engineering and has worked as a consultant in the field of pharmaceutical product formulation for more than 30 years. He is listed as the inventor or coinventor on 25 U.S. patents relating to drug delivery and medical devices.

Dr. Enscore credibly testified that petitioner used the Technology to invent a formulation and manufacturing process for a once-daily felodipine extended-release tablet that could be manufactured without causing degradation of the drug

**[*18]** and was bioequivalent to the Plendil extended-release product. Dr. Enscore testified that the felodipine formulation was an adaptation of the "granular liqui-solid" technology disclosed by the 339 patent. His testimony, in conjunction with petitioner's testimony, indicates that petitioner's invention of the felodipine formulation occurred sometime between May 10, 2000 (when petitioner applied for the 339 patent), and May 2001.

2.    <u>George M. Gould</u>

Petitioner offered, and the Court recognized, George M. Gould as an expert in the fields of patents and licensing. Mr. Gould has practiced patent law for more than 50 years. He spent much of his career as chief patent counsel for Hoffmann-La Roche, a major pharmaceutical company. He has frequently testified as an expert on patent and intellectual property law.

Mr. Gould testified that a scientist occupying petitioner's position in 1998 might have considered entering into an R&D agreement with a pharmaceutical partner, then executing licensing arrangements for particular products to which application of the Technology seemed promising. Mr. Gould expressed the view that the 1998 license agreement was, in substance, an R&D agreement, and that the March 2000 engagement letter was, in substance, a license agreement. Viewing the March 2000 engagement letter as a license agreement by which

[*19] Hygrosol transferred the felodipine formulation to Mutual, Mr. Gould opined that "all substantial rights" were thereby transferred. That was so, he testified, because felodipine was useful only as a drug and would have no value as a nutritional supplement.

F.    IRS Examination

Petitioners timely filed joint Federal income tax returns for 2007 and 2008 on Forms 1040, U.S. Individual Income Tax Return, on which they reported royalties received under the 1998 license agreement as long-term capital gain. The IRS examined those returns and issued petitioners a timely a notice of deficiency. That notice determined that the royalties received were not subject to section 1235 and should have been reported as ordinary income.

OPINION

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). At trial petitioners moved to shift the burden of proof to respondent under section 7491(a)(1). Several of the issues on which petitioners seek to shift the burden of proof involve legal conclusions, not factual matters; section 7491(a)(1) does not apply to shift the burden of proof as to them. In any event, because we decide this

[*20] case on a preponderance of the evidence, it does not matter who has the burden of proof. See sec. 7491(a); Estate of Turner v. Commissioner, 138 T.C. 306, 309 (2012).[3]

Absent stipulation to the contrary, this case is appealable to the U.S. Court of Appeals for the Third Circuit. On legal questions, we accordingly follow the precedent of that court. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

A.    Governing Statutory Framework

Royalty payments received under a license agreement are generally taxed as ordinary income. However, section 1235(a) provides that a transfer of property "consisting of all substantial rights to a patent * * * by any holder shall be considered the sale or exchange of a capital asset held for more than 1 year." This treatment applies regardless of whether the consideration received in exchange is

---

[3]Whether the burden has shifted matters only in the case of an evidentiary tie. See Polack v. Commissioner, 366 F.3d 608, 613 (8th Cir. 2004), aff'g T.C. Memo. 2002-145. In this case we discerned no evidentiary tie on any material issue of fact. See Payne v. Commissioner, T.C. Memo. 2003-90, 85 T.C.M. (CCH) 1073, 1077 (2003) ("Although assignment of the burden of proof is potentially relevant at the outset of any case, where * * * the Court finds that the undisputed facts favor one of the parties, the case is not determined on the basis of which party bore the burden of proof, and the assignment of burden of proof becomes irrelevant.").

**[\*21]** payable periodically or is contingent on productivity or use of the property. Sec. 1235(a)(1) and (2).[4]

For payments to qualify for capital gain treatment under section 1235, it is not necessary that the property transferred be patented or be subject to a patent application at the time of transfer. <u>See</u> sec. 1.1235-2(a), Income Tax Regs. It is sufficient that the taxpayer transfer all substantial rights to a patentable product that is held as a trade secret, whether or not a patent application is ultimately filed. <u>See</u> <u>Burde v. Commissioner</u>, 352 F.2d 995, 998 n.4 (2d Cir. 1965), <u>aff'g</u> 43 T.C. 252 (1964); <u>Gilson v. Commissioner</u>, T.C. Memo. 1984-447, 48 T.C.M. (CCH) 922. As the Third Circuit explained in <u>Magnus v. Commissioner</u>, 259 F.2d 893, 898-899 (3d Cir. 1958), <u>rev'g</u> 28 T.C. 898 (1957): "[O]ur inquiry is aimed at ascertaining * * * whether rights amounting to full and complete control were relinquished. A transfer of something less constitutes a mere license with the royalties * * * received thereunder taxable as ordinary income." (Fn. ref. omitted.)

---

[4]Section 1235(b)(1) defines the term "holder" to include "any individual whose efforts created such property." Respondent agrees that, for purposes of this case, petitioner is the relevant transferor and that he qualifies as a "holder" within the meaning of this section.

[*22] In determining whether "all substantial rights" have been transferred, the "circumstances of the whole transaction, rather than the particular terminology used in the instrument of transfer, shall be considered." Sec. 1.1235-2(b)(1), Income Tax Regs. See Juda v. Commissioner, 877 F.2d 1075, 1078 (1st Cir. 1989), aff'g 90 T.C. 1263 (1988); Merck & Co. v. Smith, 261 F.2d 162, 164 (3d Cir. 1958). We consider the practical effect of the terms to which the parties have agreed, but we will not reform the parties' agreement to alter its terms absent unusual circumstances. See Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967) ("[A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, [or] duress."), vacating and remanding 44 T.C. 549 (1965); Mylan, Inc. & Subs. v. Commissioner, T.C. Memo. 2016-45, at *14-*15 (discussing the Danielson rule in the context of transfers of intellectual property).

Capital gain treatment is not available where the instrument of transfer "grants rights to the grantee, in fields of use within trades or industries, which are less than all the rights covered by the patent, which exist and have value at the time of the grant." Sec. 1.1235-2(b)(1)(iii), Income Tax Regs. To ascertain

[*23] whether a taxpayer has transferred "all substantial rights," we consider whether he has retained rights that, in the aggregate, have substantial value. See E.I. du Pont de Nemours & Co. v. United States, 432 F.2d 1052, 1055 (3d Cir. 1970).

The central dispute between the parties may be encapsulated in the question: "All substantial rights to what?" Respondent submits that the instrument of transfer is the 1998 license agreement and that the crucial question is whether petitioner thereby transferred all substantial rights to the Technology. Respondent contends that the answer to this question is "no," urging that petitioner retained valuable rights to use the Patents and liquisolid technology both outside the pharmaceutical field (e.g., in developing vitamins and nutritional supplements) and inside the pharmaceutical field (e.g., in developing drugs on which he was then collaborating with other companies or might in future decline to propose to Mutual for development). Petitioners submit that the key document is the March 2000 engagement letter; that this letter was in substance a license agreement; and that the central question is whether petitioner thereby transferred all substantial rights to the felodipine and profafenone formulations. Petitioner contends that the answer to this question is "yes," urging that felodipine and propafenone have no value

[*24] outside the pharmaceutical field but are useful only as drugs. We conclude that respondent has the stronger side of this argument.

B.    Nature of the Rights Transferred

Pennsylvania law guides our construction of the relevant documents and suggests the following principles applicable to contract interpretation. The fundamental goal of contract interpretation in Pennsylvania is to ascertain the intent of the contracting parties. Robert F. Felte, Inc. v. White, 302 A.2d 347, 351 (Pa. 1973). When the terms of a written contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986); Pines Plaza Bowling, Inc. v. Rossview, Inc., 145 A.2d 672 (Pa. 1958).

If ambiguity exists in a contract, parol evidence is admissible to explain or resolve the ambiguity. This is so regardless of whether the ambiguity is latent (i.e., created by extrinsic or collateral circumstances) or patent (i.e., created by the terms of the instrument itself). See Steuart v. McChesney, 444 A.2d 659, 663 (Pa. 1982); In re Estate of Herr, 161 A.2d 32, 34 (Pa. 1960). A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. Kripp v. Kripp, 849 A.2d 1159, 1163 (Pa. 2004).

**[*25]** While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings require factual determinations by the finder of fact. Ibid.

### 1. The 1998 License Agreement

We discern little if any ambiguity in the 1998 license agreement. That agreement is the "instrument of transfer." Sec. 1.1235-2(b)(1), Income Tax Regs. Section 2 of the agreement, captioned "Grant of Exclusive Rights," provides that the licensors granted to Mutual "[t]he exclusive rights to utilize the Technology" to develop new formulations of selected Products. The rights transferred were thus the rights to use the liquisolid technology embodied in the Patents and to make and sell any "Products containing the Technology," that is, any Products successfully generated by exploitation of the Technology.

Conversely, the 1998 license agreement did not transfer rights to the formulation of any specific drug. It could not possibly have done so, because no such formulations existed in June 1998. Indeed, the parties at that time had not selected any drugs for development using the Technology, and they did not know what drugs would in the future be proposed or selected for development. Felodipine and propafenone in particular, the 11th and 12th drugs proposed by the licensors, were not selected for development until March 2000.

**[*26]** The recitals to the 1998 license agreement confirm the parties' intent. The fifth "whereas" clause states that "Hygrosol, Spireas and Bolton desire to grant to Mutual and United the exclusive right to utilize the Technology only for the development of new generic drug forms and new drug products * * * unanimously selected by" the parties. This sentence leaves little doubt that what the licensors intended to transfer to Mutual was a limited right to use the Technology, coupled with the right to make and sell any drug formulations successfully developed using the Technology.

Section 4 of the agreement, captioned "Compensation," supports respondent's view that Mutual was paying royalties for rights to use the Technology generally, not for the felodipine formulation specifically. Petitioners submit that Dr. Spireas was "the sole inventor" of the felodipine formulation and that he "invented the felodipine technology in his individual capacity as an inventor." Dr. Enscore similarly testified that petitioner invented the felodipine formulation sometime after May 2000 and that it was an adaptation of the "granular liquisolid" technology covered by the 339 patent. That patent, unlike the other Patents, was issued to petitioner individually, not to petitioner and Dr. Bolton jointly. Thus, if Mutual were paying only for the felodipine formulation, one would have expected that petitioner would receive most, if not all, of the resulting royalties.

[*27] But that is not what the 1998 license agreement provided. Section 4 provided that, if Mutual received FDA approval for and sold a Product, then 20% of the gross profit would "be paid to Hygrosol quarterly." Hygrosol was owned 50-50 by petitioner and Dr. Bolton, and Dr. Bolton would thus receive 50% of all royalties paid under the agreement. This division makes perfect sense if the royalties were paid for use of "the Technology," which at that time consisted of the 834 Patent, which was jointly owned by petitioner and Dr. Bolton. This division is hard to reconcile with petitioner's theory that the royalties were paid exclusively for a product of which he, in his individual capacity, was the sole inventor.

The conclusion that Mutual was paying royalties for use of "the Technology" is supported, not only by the terms of the 1998 license agreement, but also by the "circumstances of the whole transaction." Sec. 1.1235-2(b)(1), Income Tax Regs.; see Merck & Co., 261 F.2d at 164. See generally In re Estate of Herr, 161 A.2d at 34 ("[T]he Court in interpreting a will or a contract can always consider the surrounding circumstances in order to ascertain the intention and meaning of the parties."). During the negotiations toward the agreement petitioner clearly had, as a primary goal, maintaining control over the liquisolid technology. He testified that he was hesitant to license this technology to Mutual because he was

**[*28]** already collaborating with other companies to develop drug formulations using it. He was also interested in exploring use of the Technology in the field of nutritional supplements, such as CoQ10.

When Mutual in December 1997 proposed that it receive an exclusive license to use the Technology for all purposes, petitioner firmly rejected that idea. Under the agreement ultimately signed, Mutual was granted rights to use the Technology only with respect to Products "unanimously selected" by the parties. Mutual was explicitly denied the right to use the Technology with respect to "products that Hygrosol, Spireas, and Bolton are developing or are in negotiations to develop for another party." Rights to use the Technology would also revert to the licensors as to a given Product if Mutual did not follow through on its commitments. In short, the negotiating history confirms the parties' understanding that what was being licensed was a right to use the Technology, albeit a carefully circumscribed right to do so.

In asserting that petitioner "transferred his felodipine technology to URL [and] Mutual," petitioners ignore the dispositive provisions of the 1998 license agreement. In section 7.2, Mutual explicitly agreed "that all formulations relating to the Products containing the Technology and developed in Mutual's * * * facilities belong to Hygrosol, Spireas and Bolton," subject to Mutual's rights under the

[*29] Agreement. Section 7.4 similarly provided: "If during development of a Product, a new patent of specific application claims is secured based on the original patent, the new patent shall be the property of Hygrosol, Spireas, and Bolton." Mutual was not entitled to outright ownership of subsequently developed technology, but only "the right to utilize such patent as if described in the definition of 'Patent'" set forth in the 1998 license agreement. This makes it clear that all rights Mutual obtained were governed by, and limited by, the 1998 license agreement.[5]

### 2. The March 2000 Engagement Letter

In contending that petitioner transferred all substantial rights to the felodipine formulation, petitioners largely ignore the 1998 license agreement, which Mr. Gould opined was in substance an R&D agreement setting forth "a framework" for product development. Instead they rely on the March 2000 engagement letter, which Mr. Gould opined was in substance a license agreement. Mr. Gould's

---

[5]On brief petitioners argue that the "liquisolid patents did not cover Dr. Spireas' new, unique and patentable felodipine * * * technolog[y]." If that were so, it is hard to see how Mutual would have the rights to make and sell that Product. Mutual was granted its make-and-sell rights by the 1998 License Agreement, which defines those rights as the rights to produce, market, and sell "Products containing the Technology."

[*30] testimony on these points was unpersuasive because it ignored the terms, purpose, and effect of both documents.[6]

The March 2000 engagement letter was just that--an engagement letter. It stated rather plainly that the parties had selected three drugs for development and transmitted a $30,000 check "for engagement of these three products." It was substantially similar to 20 other engagement letters the parties signed to memorialize their selection of certain drugs for further investigation. These engagement letters grant no rights and have no royalty payment terms. Far from constituting free-standing license agreements, they simply rendered the 1998 license agreement operative with respect to the Products that they identified.

The 1998 license agreement specified that Mutual was granted rights "to utilize the Technology only to develop Products that Mutual, United and Hygrosol * * * unanimously select." Section 2.2 of the agreement provided that the period

---

[6]Expert witness testimony may help the Court understand an area requiring specialized training or knowledge. See Fed. R. Evid. 702; Snyder v. Commissioner, 93 T.C. 529, 534 (1989). But we are not bound by an expert's opinion, especially when the testimony verges on legal or quasi-legal subjects such as contract interpretation. We weigh an expert's testimony in light of his or her qualifications and with respect to all credible evidence in the record. Depending on our overall evaluation of the evidence, we may reject an expert's opinion in its entirety, accept it in its entirety, or accept selected portions of it. See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994).

[*31] during which Mutual shall have exclusive rights with respect to a Product "commences as soon as * * * said Product is identified by either party and agreed upon in writing by Hygrosol, Mutual, and United." The March 2000 engagement letter simply memorialized that felodipine and propafenone had been "identified * * * and agreed upon in writing" by the parties. The execution of this letter did no more than fulfill a condition stated in the 1998 license agreement: It served to trigger, with respect to those two Products, the "exclusive rights to utilize the Technology" granted to Mutual by section 2.1 of the agreement.

The 1998 license agreement is clearly the relevant "instrument of transfer," see sec. 1.1235-2(b)(1), Income Tax Regs., because it is the agreement that granted the rights for which Mutual paid. Indeed, in asserting that Mutual received "all substantial rights" to the felodipine formulation, petitioners necessarily rely on provisions of the 1998 license agreement stating that Mutual received rights throughout the United States for a perpetual term. Petitioners cannot logically contend that the March 2000 engagement letter served to license the felodipine formulation, while relying on the 1998 license agreement to establish that Mutu-

[*32] al's rights in that formulation were unlimited temporally and exclusive geographically.[7]

Petitioners assert that their view of the situation is supported by what they call the statute's "'in consideration of' requirement." Section 1235 provides that a transfer of property consisting of all substantial rights to a patent shall be treated as the sale of a capital asset "regardless of whether or not payments in consideration of such transfer" are payable periodically or contingent on productivity or use. Petitioners note that, among the 20-plus products the parties selected for development, felodipine and propafenone were the only two that resulted in commercial success. It therefore makes sense, they urge, to regard the royalties as having been paid "in consideration of" those two Products.[8]

---

[7]Mr. Gould's testimony was based on the premise that exclusive rights to the felodipine formulation could not have been granted in June 1998 because the felodipine formulation did not yet exist. In so testifying he assumed what he was trying to prove, namely, that the subject of the license was the felodipine formulation. If the subject of the license was "the Technology," as the 1998 license agreement unambiguously provided, the timing problem Mr. Gould imagined goes away because "the Technology" plainly existed in June 1998. Equally problematically, Mr. Gould did not convincingly explain how the March 2000 engagement letter could have served to license the felodipine formulation, since the felodipine formulation did not exist in March 2000 either. Petitioner and Dr. Enscore testified that this formulation was not invented until sometime after May 2000.

[8]We do not think it is accurate to describe the phrase "in consideration of" as setting forth a "requirement." The requirement imposed by section 1235 is that

(continued...)

**[\*33]** In advancing this argument, petitioners seek to redraft the 1998 license agreement, using hindsight, to achieve a more advantageous tax result. The liqui-solid technology had potential application to thousands of drugs; in June 1998 the parties had no idea to which drugs it might usefully be applied. As a result, they necessarily crafted that agreement as a license to use the Technology to figure out which drugs might be developed successfully.

To employ an analogy from a different industry, an oil company that licenses drilling technology inevitably uses that technology no less in drilling dry holes than in drilling successful wells. The same was true here. Mutual necessarily "utilize[d] the Technology" every time petitioner performed feasibility studies on a Product in its laboratories. Petitioner performed feasibility studies for Mutual's benefit on more than 20 Products over four years; this amounted to a significant "utilization" of the Technology by Mutual.

When entering into the 1998 license agreement, Mutual could logically expect to derive value from all such uses of the Technology. Even if feasibility studies on a particular drug did not predict a home run, those studies might yield

[8](...continued)
a "holder" must transfer "all substantial rights" in order to get long-term capital gain treatment; the phrase "in consideration of" appears to be nothing more than a routine prepositional phrase. In any event, petitioners' argument is unconvincing for the reasons discussed in the text.

[*34] valuable know-how that would assist development of similar (or redirect development toward dissimilar) Products.  Mutual might also derive value by using the Technology to cross unpromising drugs, or unpromising types of drugs, off of its list.  As is true in many licensing arrangements, Mutual contracted to pay royalties not on the basis of actual usage of the Technology, but on the basis of sales of Products containing the Technology.  The payment structure chosen by the parties does not alter the fact that Mutual paid royalties to "utilize the Technology."  Those royalties were paid "in consideration of" its use of that Technology both when its use of the Technology was successful and when it was not.

In sum, the rights transferred to Mutual are those granted to it by the 1998 license agreement and only those rights.  While resisting the conclusion that this agreement was the relevant "instrument of transfer," petitioners have not identified any other document that could have granted to Mutual, and defined, the specific rights that Mutual in fact possessed.  We conclude that the terms of the 1998 license agreement and the extrinsic circumstances both support what we believe to be its clear meaning.  The rights granted to Mutual under the agreement were the limited rights "to utilize the Technology * * * to develop Products" and to make

**[*35]** and sell "Products containing the Technology." This resolves the first part of our inquiry, which required us to identify the nature of the rights transferred.[9]

C.    Substantiality of the Rights Retained

The remaining question is whether petitioner in the 1998 license agreement transferred  "all substantial rights" to the Technology. We conclude that he did not. The rights granted to Mutual were less than all the rights in the Technology because the license was limited to the pharmaceutical industry and was restricted to specific Products selected by the parties. We find that the licensors' retained rights had substantial value.

A taxpayer does not transfer "all substantial rights" to a patent if the instrument of transfer "grants rights to the grantee, in fields of use within trades or industries, which are less than all the rights covered by the patent, which exist and

---

[9]As an alternative to the theory that the March 2000 engagement letter was in substance a license agreement transferring the felodipine formulation to Mutual, petitioners assert in their answering brief that the parties behaved "as if the 1998 License Agreement grant and royalty provisions applied to these technologies after their respective inventions." As legal support for this alternative theory, petitioners suggest the contract doctrine of "substitute performance." We are generally reluctant to consider arguments advanced for the first time in a party's answering brief, and we will decline to do so here. See DiLeo v. Commissioner, 96 T.C. 858, 891, 892 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992); Shelby U.S. Distribs., Inc. v. Commissioner, 71 T.C. 874, 885 (1979). In any event, we find no factual support in the record for the notion that the parties conducted themselves "as if" the 1998 license agreement applied, rather than in the belief that it actually applied.

**[*36]** have value at the time of the grant." Sec. 1.1235-2(b)(iii), Income Tax Regs. In determining whether a taxpayer has transferred "all substantial rights," the Third Circuit has evaluated whether the taxpayer has retained rights that, in the aggregate, have substantial value. See E.I. duPont de Nemours & Co., 432 F.2d at 1055.

In at least two respects, the 1998 license agreement did not transfer all substantial rights to the Technology. First, the agreement did not transfer to Mutual all rights to use the Technology within the pharmaceutical field. Section 5.5 of the agreement explicitly denied Mutual any rights with respect to drug products petitioner was already investigating. It provided: "The group of potential Products to be selected by the parties to this Agreement shall exclude, at all times during the life of this Agreement, products that Hygrosol, Spireas, and Bolton are developing or are in negotiations to develop for another party."

The agreement also gave petitioner and his co-licensors effective veto power over the drugs as to which Mutual could exercise its rights in the future. The Technology had potential application to thousands of drugs, but section 2.1 granted Mutual rights to use the Technology "only to develop Products that Mutual, United, and Hygrosol * * * will unanimously select." The agreement required the licensors to act "in good faith" when proposing (or declining to propose) Products

[*37] for development. But situations can easily be imagined in which the licensors might have concluded, acting in good faith, that Company X would be a more logical development partner for a particular Product than Mutual.[10]

The parties understood that additional work would be required to adapt the liquisolid technology to the variables of individual drugs. But this does not diminish the value of the Technology generally or of petitioner's retained rights to use it. Petitioner negotiated assiduously to maintain control over his patented liquisolid techniques; this strongly implies a belief that the rights he retained had value. Although felodipine and propafenone turned out to be the only drugs successfully developed between 1998 and 2004, when petitioner left Mutual's employ,[11] this outcome was not foreseeable when the parties negotiated the agreement. We accordingly find and hold that the licensors' retained rights to use the Technology within the pharmaceutical industry, as of June 1998, had substantial value.

Second, petitioner retained under the 1998 license agreement all rights to use the Technology outside the pharmaceutical field, e.g., in developing nutrition-

---

[10]One example might be where Company X holds the patent on a particular molecule but cannot bring it to market for lack of a viable formulation. Petitioner testified at trial that this was not uncommon.

[11]The record does not disclose what drugs or other products petitioner may have developed using the liquisolid technology after 2004.

[*38] al supplements, vitamins, and other products not requiring FDA approval. The restriction of a license to one field of use, where a reserved field of use has value at the time of the grant, fails to convey "all substantial rights." See Mros v. Commissioner, 493 F.2d 813, 817 (9th Cir. 1974), rev'g T.C. Memo. 1971-123; Fawick v. Commissioner, 436 F.2d 655, 663 (6th Cir. 1971), rev'g 52 T.C. 104 (1969); sec. 1.1235-2(b)(1)(iii), Income Tax Regs.

When he executed the 1998 license agreement, petitioner was extremely interested in exploring use of the Technology to develop "super-bioavailable" or other new formulations of nutritional supplements like CoQ10. Indeed, in February 1998 he engaged one or more professionals to market the liquisolid technology to various companies in the health and nutrition fields. At trial, petitioner suggested that these retained rights had little commercial value because (for example) consumers might refuse to pay extra for a supplement containing a smaller dose of the active ingredient. But his testimony on this point was anecdotal and conclusory, and it was at odds with other portions of his testimony.

Once again, it is implausible that petitioner would have negotiated so insistently to retain rights to use the Technology in the nutrition field if he was convinced that these rights had no value. We accordingly find and hold that the rights

[*39] petitioner and his co-licensors retained to use the Technology, both within the pharmaceutical field and in other fields, in the aggregate had substantial value.

D.    Conclusion

Petitioner in June 1998 negotiated a deal to license use of the Technology to Mutual on a limited, product-by-product, basis.  It is possible that he might have struck a different deal:  He might initially have proposed an R&D arrangement (as Mr. Gould would probably have advised), then waited several years to see what developed.  The record does not establish what motivated his decision.  Time may have been of the essence, or the "bird in hand" mantra may have carried the day.

"While a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not."  Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974).  Petitioner wishes to revise the agreement he negotiated in 1998, which by its terms granted a limited right to use "the Technology," and replace it with a different arrangement that, in hindsight, might appear to generate a more desirable tax outcome.  Petitioner is not at liberty to undo the deal he made or the documents he signed.  See Commissioner v. Danielson, 378 F.2d at 775.  Because petitioner in the 1998 license agreement did not transfer "property consisting of all

**[*40]** substantial rights to a patent," section 1235(a) does not apply.  We thus sustain respondent's determination that the royalties petitioners received are taxable as ordinary income.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.