T.C. Memo. 2019-5

UNITED STATES TAX COURT

ANTHONY MEGGS AND BETH MEGGS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14604-12.                    Filed February 4, 2019.

<u>Christopher J. Rajotte</u>, <u>Joseph A. DiRuzzo III</u>, <u>Jeffrey J. Molinaro</u>, and

<u>Jennifer Correa Rierra</u>, for petitioners.

<u>Derek P. Richman</u> and <u>Daniel C. Munce</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, <u>Judge</u>:  In a notice of deficiency dated March 13, 2012, respondent

determined the following deficiencies and penalties:[1]

---

[1] Unless otherwise indicated, all section references are to the Internal

(continued...)

[*2]

| Year | Deficiency | Penalty sec. 6662A |
|------|------------|--------------------|
| 2006 | $467,150 | $137,397 |
| 2007 | 118,812 | --- |

After concessions,[2] the issue for decision is whether $813,978 and $455,264, respectively, were properly classified as capital gains for the 2006 and 2007 tax years.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts are incorporated in our findings by this reference. Petitioners resided in Florida when they timely filed their petition.

Petitioner Anthony Meggs began his career in business working for American Express, starting in its account services department and eventually

---

[1](...continued)
Revenue Code of 1986, as amended and in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[2] Respondent conceded that petitioners did not understate their trust income by $576,000 for 2006. Petitioners conceded that they were not entitled to a $576,000 deduction for contributions to a trust for 2006, that they were not entitled to $209,461 of the charitable contribution deduction they claimed for 2007, and that they are liable for a sec. 6662A accuracy-related penalty for an understatement with respect to a reportable transaction.

[*3] being promoted to senior project manager. During this time he focused on process improvement and automation. After seven years he left American Express and worked in supply-chain management. In December 2001 he joined Hancock Information Group (HIG) as vice president of business development.[3]

HIG provided business-to-business lead generation services for its clients. It contacted potential customers for its clients and arranged appointments for its clients' sales teams. Lori Sprague was HIG's executive vice president. Ms. Sprague hired Mr. Meggs, and they developed a friendly working relationship. Precision Response Corp. (PRC) acquired HIG in late 2001 or early 2002.

Under his 2001 employment contract, HIG paid Mr. Meggs both a salary and a 3% commission. His salary started at $120,000 in his first year and was set to decrease by $20,000 in each subsequent year. Thus, commissions would make up a greater portion of his pay as he settled into his position. Commissions from each client's billings also decreased over six years, creating an incentive for Mr. Meggs to sign new clients. In 2002 Mr. Meggs and HIG agreed to modify his compensation structure, forgoing any salary in favor of straight 4% commission payments.

---

[3] Mr. Meggs' employment contract with HIG, dated November 27, 2001, offers him the position of vice president of sales.

**[*4]**  In mid-2002 Mr. Meggs began to design a method by which a business allocates leads and marketing efforts to its sales pipelines on the basis of each pipeline's capacity to develop leads effectively.  On September 17, 2002, Mr. Meggs filed a provisional patent application for his method, calling it "Method and Apparatus for Managing Resources within an Organization and in the Sales and Marketing Pipeline" (Pipeline IP).  On September 16, 2003, HIG waived any rights it had in Pipeline IP and Mr. Meggs filed a regular, nonprovisional, patent application for Pipeline IP.

Mr. Meggs' decision to patent Pipeline IP stemmed from his 2002 discussions with representatives of American Express Corporate Services (USCC) regarding the possibility of contracting with HIG for lead generation services.  He successfully secured the USCC account for HIG in October 2002, and HIG's work on the account began in December 2002.  USCC was the first American Express account that Mr. Meggs secured for HIG.  In 2003 he secured the American Express OPEN (OBSN) account for HIG.  HIG's work on the OBSN account began in early November 2003.  And in November 2003 Mr. Meggs secured the American Express Travel One (Travel One) account, on which HIG's work began on January 2, 2004.  Pipeline IP was an important aspect of Mr. Meggs' successful

[*5] effort to secure the three American Express accounts for HIG.  He was not involved in managing the accounts after he secured them.

In 2004 Mr. Meggs' relationship with HIG changed again.  On May 3, 2004, he and HIG signed a broker agreement (2004 broker agreement) under which he was no longer an employee of HIG but instead a broker on HIG's behalf through his wholly owned S corporation, Caleb, Inc. (Caleb).  Under the 2004 broker agreement, Mr. Meggs continued to receive a 4% commission from new account billings.  However, these commissions terminated three years from the date on which HIG's work on the account originated.  The origination date was the day on which HIG began to make calls or do production work for an account.

InterActiveCorp, PRC's parent company, began to consider a sale of PRC towards the end of 2005.  PRC was using Pipeline IP with Mr. Meggs' permission and, in preparation for its sale, PRC tasked Ms. Sprague with obtaining the rights to Pipeline IP.  In December 2005 Ms. Sprague approached Mr. Meggs about acquiring the rights to Pipeline IP.  Mr. Meggs needed cash to support another venture and was receptive to a transfer.  In early 2006 he proposed two options: (1) he would license Pipeline IP to PRC and receive royalties, which would increase once the patent was awarded or (2) he would assign all rights in Pipeline IP to PRC in exchange for an extension of his commissions from the American

[*6] Express accounts. These options were summarized in an email that he sent Ms. Sprague in February 2006. Both he and Ms. Sprague wanted to act quickly, and on February 14, 2006, Mr. Meggs executed an assignment of Pipeline IP to PRC.[4] As of the time of trial, the patent application for Pipeline IP had been abandoned.

Also in early 2006 Mr. Meggs and PRC executed a written addendum to his commission structure, dated January 2, 2006 (2006 addendum), with a handwritten date of "1/2/06" by Mr. Meggs' signature. The 2006 addendum extended the period during which Mr. Meggs would receive commissions from the American Express accounts to 3-1/2 years from their origination dates.

Under the 2004 broker agreement the origination and termination dates for the three American Express accounts were as follows:

|  | Origination date | Termination date |
|---|---|---|
| USCC | December 2002 | December 2005 |
| OBSN | November 2003 | November 2006 |
| Travel One | January 2, 2004 | January 2, 2007 |

Under the 2006 addendum the origination and termination dates for the American Express accounts were revised as follows:

---

[4] Mr. Meggs executed another, notarized assignment of Pipeline IP to PRC on May 6, 2006.

**[*7]**

|  | New origination date | New termination date |
|---|---|---|
| USCC | January 1, 2004 | June 30, 2007 |
| OBSN | January 1, 2004 | June 30, 2007 |
| Travel One | January 2, 2004 | June 30, 2007 |

The 2006 addendum explained that these changes were made "due to the circumstances surrounding AMEX USCC and AMEX [OBSN]".

Mr. Megg's commissions on the American Express accounts remained at 4% under the 2006 addendum. The 2006 addendum also provided that in the event PRC terminated its relationship with Mr. Meggs, it "agrees to pay the equivalent of one month's commission (based on the average of the most recent 12 months of commissions) for each year of service provided." Neither Mr. Meggs nor Ms. Sprague consulted a lawyer in connection with the transfer of Pipeline IP or the 2006 addendum.

During the years in issue, Mr. Meggs received the following amounts as commissions from the American Express accounts:

|  | 2006 | 2007 |
|---|---|---|
| USCC | $424,431 | $211,331 |
| OBSN | 779,094 | 300,773 |
| Travel One | 61,518 | 40,634 |

[*8] The amounts Mr. Meggs received as commissions from the American Express accounts generally were consistent from month to month. HIG issued a Form 1099-MISC, Miscellaneous Income, to Caleb reporting a payment from PRC of $1,307,922 in nonemployee compensation for 2006.

On December 1, 2007, PRC terminated its broker relationship with Caleb as it prepared to file for bankruptcy. PRC filed for bankruptcy on January 23, 2008. Mr. Meggs filed a proof of claim in PRC's bankruptcy case on April 9, 2008, for $511,799 in severance pay. He miscalculated the severance pay he was due; he included commissions attributable to periods after the termination date for the American Express accounts. After the termination date the American Express accounts were considered "house accounts", meaning that commissions were not owed, but PRC's internal records still calculated commission amounts attributable to Mr. Meggs even though he was not entitled to receive them. Ultimately, the parties agreed to a lower severance amount.

Petitioners reported $396 of long-term capital gains on their 2006 Form 1040, U.S. Individual Income Tax Return. Caleb reported $1,324,520 of total income on its 2006 Form 1120S, U.S. Income Tax Return for an S Corporation, in April 2007. Petitioners and Caleb each amended their 2006 return in October 2008. On their 2006 Form 1040X, Amended U.S. Individual Income Tax Return,

[*9] petitioners reported $813,978 of long-term capital gains and attributed them to "Patent".[5] Caleb reduced its reported total income by $813,978 to $510,542 on its amended 2006 Form 1120S and reported a loss of $466,444 for the 2006 tax year.

On their 2007 Form 1040, filed on October 9, 2008, petitioners reported $549,597 of long-term capital gains, also attributed to "Patent". Petitioners reported the portion of the payments to Mr. Meggs attributable to the 2006 addendum as long-term capital gains. On its 2007 Form 1120S, Caleb reported total income of $149,138 and a $140,339 business loss.

## OPINION

I. Burden of Proof

Ordinarily, the burden of proof in cases before the Court is on the taxpayer. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Under section 7491(a), in certain circumstances the burden of proof may shift from the taxpayer to the Commissioner. The resolution of this issue does not depend on which party

---

[5] Mr. Meggs mistakenly reported a greater amount of long-term capital gains for 2006 on his Form 1040X than was correct because he based his calculations on an incorrect origination date for OBSN, resulting in an overestimate of the payments attributable to the 2006 addendum. The correct amount of 2006 long-term capital gains will be determined in Rule 155 computations.

**[\*10]** has the burden of proof, however, because we resolve it on a preponderance of the evidence in the record.  See <u>Knudsen v. Commissioner</u>, 131 T.C. 185, 189 (2008), <u>supplementing</u> T.C. Memo. 2007-340; <u>Schank v. Commissioner</u>, T.C. Memo. 2015-235, at \*16.

## II.  Classification of Income

We must decide whether any of the payments under the 2006 addendum were in exchange for Pipeline IP or were owed to Mr. Meggs under his broker agreement.  We start with section 1235.

### A.  Section 1235

Section 1235(a) provides that the "transfer \* \* \* of property consisting of all substantial rights to a patent \* \* \* by any holder shall be considered the sale or exchange of a capital asset held for more than 1 year".  This treatment applies regardless of whether payments in consideration of the transfer are payable periodically or are contingent on the productivity, use, or disposition of the property.  Sec. 1235(a).  The patent need not be in existence at the time of transfer if the requirements of section 1235 are otherwise met.  Sec. 1.1235-2(a), Income Tax Regs.

All substantial rights to a patent means "all rights \* \* \* which are of value at the time the rights to the patent \* \* \* are transferred."  <u>Id.</u> para. (b)(1).  We

[*11] consider "[t]he circumstances of the whole transaction, rather than the particular terminology used in the instrument of transfer" in determining whether all substantial rights were transferred. Id. (flush language); see Soffron v. Commissioner, 35 T.C. 787, 789 (1961); Spireas v. Commissioner, T.C. Memo. 2016-163, at *22, aff'd, 886 F.3d 315 (3d Cir. 2018). The holder, for purposes of section 1235, includes "any individual whose efforts created such property". Sec. 1235(b)(1).

Respondent does not dispute that Pipeline IP was transferred or that the transfer of Pipeline IP meets the requirements of section 1235. However, respondent does dispute that the payments attributable to the 2006 addendum were made in consideration for that transfer and should be treated as long-term capital gains under section 1235. To decide this dispute, we must analyze the terms of the addendum.

B. Contract Interpretation

"The cardinal rule in the interpretation of contracts is to ascertain the mutual intention of the parties". Pickren v. United States, 378 F.2d 595, 599 (5th Cir. 1967). Under Florida law, we limit the scope of our search to the four corners of

**[*12]** the document if its terms are clear and unambiguous.[6] Crawford v. Barker, 64 So. 3d 1246, 1255 (Fla. 2011). Where the terms of the document are unclear or ambiguous, we "may consider extrinsic evidence as well as the parties' interpretation of the contract to explain or clarify the ambiguous language." Levitt v. Levitt, 699 So. 2d 755, 757 (Fla. Dist. Ct. App. 1997). A term is ambiguous when it is susceptible of more than one interpretation. Friedman v. Va. Metal Prods. Corp., 56 So. 2d 515, 517 (Fla. 1952); Strama v. Union Fid. Life Ins. Co., 793 So. 2d 1129, 1132 (Fla. Dist. Ct. App. 2001). The parties' construction of ambiguous terms in a contract "is entitled to great weight in determining its meaning." Pickren, 378 F.2d at 600.

However, extrinsic evidence is admissible under Florida law only to explain a latent ambiguity; it is not admissible to explain a patent ambiguity. Carson v. Palmer, 190 So. 720, 722 (Fla. 1939); Clayton v. Poggendorf, 237 So. 3d 1041, 1047 (Fla. Dist. Ct. App. 2018). A patent ambiguity is uncertainty on the face of a document arising "from defective, obscure, or insensible language", and a latent

---

[6] We look to State law to determine what kind of interest or right a taxpayer has in property. Morgan v. Commissioner, 309 U.S. 78, 80-81 (1940). Florida law governs our interpretation of the 2006 addendum because all of the parties to the contract resided in Florida at all relevant times and the place of performance under the 2006 addendum was in Florida. See Gov't Emps. Ins. Co. v. Grounds, 332 So. 2d 13, 14-15 (Fla. 1976).

**[\*13]** ambiguity "is said to exist where a contract fails to specify the rights or duties of the parties in certain situations and extrinsic evidence is necessary for interpretation or a choice between two possible meanings." MDS (Can.) Inc. v. Rad Source Techs. Inc., 720 F.3d 833, 844 (11th Cir. 2013) (quoting Forest Hills Util. Inc. v. Pasco Cty., 536 So. 2d 1117, 1119 (Fla. Dist. Ct. App. 1988)).

The text of the 2006 addendum is susceptible of more than one interpretation. Specifically, in the provision that resets the origination dates of USCC and OBSN, the clause "NOTE: due to the circumstances surrounding AMEX USCC and AMEX [OBSN]" exhibits characteristics of both patent and latent ambiguities; it is not clear to what, if anything, within the document it refers, and more than one "circumstance" may have surrounded the American Express accounts.[7] Therefore, we are not limited to the four corners of the 2006 addendum, and we may consider "the practical construction which the parties themselves placed on the contract". Pickren, 378 F.2d at 600; see also MDS (Can.) Inc., 720 F.3d at 844 ("Florida courts have recognized 'intermediate

---

[7] For example, respondent posits that the clause refers to the possibility that Mr. Meggs would attempt to take the American Express accounts for himself. See infra p. 16. Alternatively, the clause could refer to the importance of Pipeline IP to securing and maintaining the American Express accounts.

**[*14]** ambiguity,' when both latent and patent ambiguity exists; extrinsic evidence is permitted to clarify the parties' intentions.").

Respondent contends that the payments under the 2006 addendum were not consideration for Pipeline IP but rather for some other purpose and that petitioners were compensated for Pipeline IP--which respondent argues had little to no value--in some other way. First, respondent points out that there is no reference in the 2006 addendum to the transfer, Mr. Meggs did not retain a security interest, and the addendum includes several provisions standard in a commission agreement. Second, respondent argues that the circumstances surrounding the 2006 addendum do not support petitioners' claim. He argues that the 2006 addendum was executed before Mr. Meggs' discussion with Ms. Sprague about transferring Pipeline IP, and he asserts that both parties would have obtained legal assistance with the transfer. And third, respondent argues that the form of the transaction does not support petitioners' claim because both PRC (on a Form 1099-MISC) and petitioners (on their tax return) initially reported the 2006 payments as nonemployee compensation to Caleb rather than as consideration for Pipeline IP, and petitioners cannot escape the tax consequences of their chosen form.

[*15] There is no explicit reference to the transfer of Pipeline IP in the 2006 addendum and the date on the 2006 addendum, January 2, 2006, by itself seems to support respondent's contention that the addendum was signed before and, therefore, was independent of the discussions between Mr. Meggs and Ms. Sprague about the transfer of Pipeline IP. However, the most coherent explanation for the sequence of events, on the basis of the record before us, is that offered by petitioners. First, Ms. Sprague credibly testified that she approached Mr. Meggs about the transfer in December 2005. Mr. Meggs, Ms. Sprague, and John Turner, HIG's director of human resources, credibly testified that "the circumstances surrounding AMEX USCC and AMEX [OBSN]" referred to the transfer of Pipeline IP. They also credibly testified that they understood the 2006 addendum to be consideration for the rights to Pipeline IP. We believe it is significant that the parties to the 2006 addendum conceive of it in the same way.

At trial neither petitioners nor respondent questioned whether January 2, 2006, was the date it was signed. It is possible that the 2006 addendum was signed on January 2, 2006, in contemplation of some sort of transfer. It also is possible that January 2, 2006, was meant to be the effective date of the 2006 addendum and was thought required because of the original December 2005 termination date of the first American Express account and the 2006 addendum

**[\*16]** was signed sometime later. In any event, in the context of the other evidence, in particular the credible testimony of key participants in the transaction, we cannot conclude that the date on the 2006 addendum forecloses a conclusion that PRC agreed to pay the additional amounts under the 2006 addendum in exchange for Pipeline IP.

Respondent's other alternative explanations lack any support in the record. He suggests that the 2006 addendum was a makeshift noncompete agreement rather than consideration for the rights to Pipeline IP and that PRC compensated Mr. Meggs for those rights in some other way. However, Mr. Meggs had no involvement with the American Express accounts after securing them for HIG, and we have found no evidence that Mr. Meggs had the desire or the capacity to manage the American Express accounts himself. The record shows that PRC valued Pipeline IP. Ms. Sprague was tasked with acquiring Pipeline IP from Mr. Meggs, not a noncompete agreement. For this reason we also reject respondent's other theory that Pipeline IP had only nominal value to PRC. We are also convinced that PRC would want something in return for the additional payments and the only valuable consideration remaining is Pipeline IP. Therefore, we find on the record before us that the 2006 addendum provided for additional payments in exchange for his transfer of all rights in Pipeline IP to PRC.

[*17] We also find that Mr. Meggs' and Ms. Sprague's failure to obtain legal advice or Mr. Meggs' failure to retain a security interest was a reflection of the parties' circumstances as they were discussing the transfer rather than evidence that the 2006 addendum constituted an ordinary commission or noncompete agreement. Both Mr. Meggs and Ms. Sprague were focused on transferring Pipeline IP as soon as possible--Mr. Meggs wanted cash to invest in a new venture, and Ms. Sprague wanted to obtain the rights before PRC was sold. They had worked together since 2001 so it is plausible that they would have a level of trust.

And we are not convinced that PRC's reporting of the 2006 payments indicates that the 2006 addendum did not relate to Pipeline IP. Because those payments mirrored Mr. Meggs' commissions, it was reasonable for both PRC and Mr. Meggs to continue reporting commission payments as they always had in the absence of any tax or legal advice. We will not bind petitioners to the reporting by PRC in the face of other contrary evidence before us.

C. Unreported Income

Finally, we find that the record does not support respondent's argument that Mr. Meggs received additional commission income in 2007 that he did not report. We accept Mr. Meggs' explanation that he miscalculated the severance pay he

**[\*18]** claimed in PRC's bankruptcy proceedings; and we accept his explanation, and Ms. Sprague's, that PRC's internal records included commission payments for the second half of 2007 that Mr. Meggs was not entitled to receive. At trial respondent indicated that he would move to amend his answer to state that petitioners had unreported income. We instructed respondent to make that motion in writing. No motion was filed; instead respondent argues on brief that while he has not moved to increase the deficiency, the unreported income he alleges "would likely more than offset any reduction in deficiency resulting from any PRC income being characterized as capital gain." We will not accept his invitation to end run the procedure for addressing the unreported income issue, particularly in the light of the questions that petitioners raised about respondent's claim.

D. Conclusion

Mr. Meggs' transfer of Pipeline IP to PRC met the requirements for long-term capital gains treatment under section 1235. Because the payments on the American Express accounts attributable to the 2006 addendum, as determined in Rule 155 computations, were consideration for the rights to Pipeline IP, those payments are properly classified as long-term capital gains for those taxable years.

Any contentions we have not addressed we deem irrelevant, moot, or meritless.

**[*19]**  To reflect the foregoing,

Decision will be entered under

Rule 155.